The final argument this morning before the panel is in Appeal 2008-1021, Roche Palo Alto v. Apotex. Good morning, Mr. Pocatillo. How are you? Welcome to the court. Please help us out with this case. I'll do my best, Your Honor. For the record, my name is Manny Pocatillo, and I'm representing the defendants in this case, Apotex Inc. and Apotex Corp., and with me at the council table is Robert Silver, my partner. This is a question about the reverse doctrine of equivalence, and the question is, is the product so far changed in principle that it performs the same or similar function in a different way? What is so wonderfully new, marked, and improved about your product that we should grant you the equitable remedy of reverse doctrine of equivalence? Your Honor, that assumes that it has to be remarkably improved. It does not have to be remarkably improved. What is your standard? It just has to be different? It has to be substantially different. Can it be substantially worse? It can be substantially worse. And so why would you construe an equitable doctrine to protect someone who creates a substantially worse product? The reason is because the equitable principle here has to do with the extension of a claim to cover something that it wasn't meant to cover. So, if an infringer uses each of the elements that are claimed in a claim and literally falls within it, but does it in a completely different way, a way that was not contemplated by the inventor, that is not an infringement under the reverse doctrine of equivalence. And so, Mark, how can you, in your formulation, which the .004% of 040 falls within the definition or the scope of the formulas under the patent, what's so different, new, and either worse or changed about what Apitex has done that entitles it to reverse DOE? The difference is that in the ANDA 2, it attains the same result of stabilizing, but by a different method. So the real answer is we added salt. Beg your pardon? We added salt. Our product in the ANDA 2 has salt, as well as all the things that the claim limitations call for. That's not correct, Your Honor. The reason why I say that is salt was in both the ANDA 1 and in the ANDA 2 in almost the same amounts. But because in the ANDA 2 there was so much less octoxanol 40 being used, the principle of the operation was changed. And the principle of the operation was changed because of the fact there wasn't sufficient octoxanol 40 in the second solution to enable it to solubilize the KT and the back ions. What difference does it make whether it stabilizes or doesn't stabilize? Because the claim construction seemed to be that the purpose of the 040 was not a separate claim limitation. So if you have the claimed range amounts of 040, that's all that's required to meet the claim, because whether it works to stabilize or not isn't a separate claim limitation. Your Honor, under the reverse doctrine of equivalence, if that which falls within the exact confines of the claim performs a result in a substantially different way, then there is a reverse doctrine of equivalence. You may be right, but I'm trying to test that proposition because it's not clear to me that in a formulation case it makes any sense to talk about things working by a different principle, because a formulation type claim doesn't talk about principles, it just talks about ingredients. You put in 3 pounds of X and 2 pounds of Y and 1 pound of Z and you stir it together and that's the mixture that I claim. And whether it does this or that or performs certain functions or does it in a certain way is not part of the invention. The invention is just a recipe type invention. That would normally be the case, Your Honor. But in this case, the only reason the patent was held valid in the first case was because of the fact that there was an alleged robust stability performed by the surfactant octoxenyl 40. Right. I recall that, but I don't see why that makes any difference, because we're not talking about what motivated the examiner to grant to allow the claim, we're talking about whether there's any scope for reverse DOE in the case of a recipe type claim. Your Honor, there is. Well, what case says there is? It doesn't do any good for one person to say there is, the other person says there isn't. Yes, there is. No, there isn't. Yes, there is. No, there isn't. That doesn't help us. So what precedent shows in a formula type case that the principle or mechanism or way gets you out of infringement? Your Honor, in the Graver-Tang case, it was the substitution of a different material, which was within the claim limitation, that caused the product to work in a different manner. And that was considered to be an equivalent under the doctrine of equivalence. In the Westinghouse case— We're not interested in the doctrine of equivalence. We're interested in the reverse doctrine of equivalence. Well, Your Honor— There's a throwaway line in Graver-Tang about the reverse doctrine of equivalence, but it was not an issue in the case. So I don't see that the holding had anything to do with the reverse doctrine of equivalence. But, Your Honor, in the formulation case, the only reason that the patent was held valid by the district court and affirmed by the Court of Appeals for the Federal Circuit was because of the fact that there was alleged unexpected results— I understand that. —from the abdoxinal 40 being a robust ability— I understand that, but how does that change the availability of the reverse doctrine of equivalence? Your Honor, the reverse doctrine of equivalence covers products. A solution, a composition, is a product. The product here works in a different way than does the prior product. And because the result is stabilisation, in other words, enabling the solution to be clear in the eye, there is a result that's performed in a way in the first composition, which includes the abdoxinal 40 creating micelles which encapsulate the ions— —all that is claimed is an ingredient at a certain concentration which your product has. Your Honor, this Court affirmed the district court saying that the stabilisation was a function. And the point is, if the stabilisation is a function, then the way in which you get that function— —is not what is unclaimed but discussed or known elsewhere. It is claimed, Your Honor. It says that the abdoxinal 40 is for stabilisation. It says so right in the claim. Yeah, but the claim construction by the district judge was that that doesn't add anything. That doesn't change anything. That wasn't a claim limitation, he said. But the point was that the judge said it was still nonetheless a result of the abdoxinal 40. I thought he said it was an intention of adding O40. I'm sorry, I didn't— An intention that by adding O40 you might get stabilisation. But the point is, it said that that was the result that was accomplished by that abdoxinal 40. And the point is, it is not performing that result in ANDA 2. Well, this is my question for you. The district court in Syntax 1 explicitly considered concentration lower than 0.005%. Your Honor, 0.005% according to the district court and the affirmance by the Court of Appeals for the Federal Circuit showed that there was a test of 0.005% which did not work. That was in the— But it considered 0.005% in making its findings. It didn't limit— But that's because the ANDA that was being tested for infringement was at a percentage of 0.01%, which is 2.5 times what we have in this case. And the point is, with 2.5 times— Did the district court limit the scope of the claim to a less broad formula than claimed in the patent because it didn't work? No, Your Honor. Your Honor, they did not do that in the earlier test. Then why isn't a claim preclusion? If they considered the same concentration of 0.40, i.e., lower than 0.005% in the first case, why isn't 0.004% in this case precluded by the finding in Syntax 1? The reason it's not precluded is the earlier decision said that 0.005% didn't work. And I'll cite you the section, Your Honor. You're talking about what the district court found? You're not talking about prosecution history or anything like that? If you go to 8264-5, you will see in paragraph 46, the following— Okay. What's the page again? It's 8263-264. It goes from paragraph—it starts with paragraph 46, and it then goes on to say that specifically in a solution of 0.5% weight-per-volume caterelectromethamine, 0.1% EDTA, 0.7% weight-volume solute chloride, and 0.01% weight-volume BAC that was stored for two months at various temperatures, an ontoxinal 40 concentration of 0.01% weight-volume kept the solution free of particulate matter. But an ontoxinal 40 concentration of 0.005% weight-volume did not keep the solution free of particles. That is exactly what the stabilization is supposed to prevent. So it didn't work at the lower amount. And there are cases where when the plaintiff tries to extend the claim to the full permissible extent of the claim language, the patent is held invalid. For example, in the Liebel-Flarschein case under 35 U.S.C. 112, that claim became invalid because it didn't read on a jacketed shield. But nobody made that decision here. The prior decision, whether you like it or you don't, whether it came down before or after KSR. I mean, I understand the frustration with the timing of the decision, so you want another try at obviousness. But the decision is the decision. It didn't limit this decision, this prior decision. It didn't say this patent no longer includes 0.004%. Did it? I don't read any claims. It doesn't say that, Your Honor. But based on this decision alone, you can see that the 0.004% does not work. And the point is if the claim covers something that doesn't work, it's invalid. And we should have an opportunity to prove that. Why didn't you do it the prior? I'm sorry. I have the same question. Why didn't you attack on all validity grounds in the first trial? There were too many errors to take everything up in 50 pages, and we were denied the right to do so, Your Honor. No, I mean in front of the district court. You're now asking for a chance to go back to the district court and litigate an invalidity ground that was not proffered in the first trial. But, Your Honor, what is relevant here is that the reverse doctrine of equivalence is a doctrine that applies in this case. And it does give us the basis for going back to the district court because the two avenues are so substantially different in the way they work that it's improper to extend the scope of the claim as it is claimed over into the present composition of the application. You can say you're just extending the scope of the claim, but it doesn't make a lot of sense to me. You don't have to extend the literal scope of the claim. The literal scope of the claim is what it is. It's not being extended. It just is what it is. Now, the reverse doctrine of equivalence, where it applies, cuts back on the literal scope of the claim. So we really aren't dealing with somebody extending the scope of the claim. They're just enforcing the scope of the claim as construed by the district judge. It seems to me what you're really saying is these claims are invalid. This is an inoperative invention as part of the range claim, and we should be able to prove that now. And the only problem I have with that is you could equally have proven that at the first trial but didn't. So it looks like there's a serious problem here of having omitted some grounds of validity in the first trial that under normal claim preclusion should block you from doing it in a second trial. Your Honor, if this hadn't been decided, we came up here on the reverse doctrine of equivalence. That's all we want you to consider. We don't want you to consider that the claim is invalid. As far as we're concerned, all it does is prove our expert was correct when he says it doesn't work at the lower amount of 0.04 of R and the 2. And that is the reason we cited that. But if that's true, then the claim is invalid. Well, it may be. But it's already been held valid as against all the attacks that you brought in the first trial, and no one limited what number or variety of attacks you could bring on the validity of the patent. But, Your Honor, what I'm here right now to say is that there is a different product that does not infringe. And we're saying that the reverse doctrine of equivalence applies to it. We're not even going into invalidity. We don't have to raise that invalidity issue at the district court. The fact is that under the reverse doctrine of equivalence, this is a product that does not infringe because it works in a different way. The other side is saying that you really are attacking validity. But because of claim preclusion case law, you don't admit you're attacking validity. You rephrase it in terms of seeking the protection of the reverse doctrine of equivalence. But the effect would be the same as invalidating the patent on a ground not previously proffered. It doesn't matter. The fact is if you have a valid infringement argument, it doesn't matter if the claim may be invalid if all you're attacking is infringement. And we are only attacking infringement with this. We are attacking infringement because the second product does not work the same way to perform the result. You're saying because the second product includes saline solution? The second product and the first product included saline solution. But in the first product, the saline solution had nothing to do with the stabilization. It had to do with the fact that octoxanil 40 was there in enough supply that it caused my cells to form, which stabilized the form. So in the second product, you've reduced the O40 and you've still got saline. So how does it work in a different manner? Well, the stabilization is now performed by what is known as ionic stabilization, which is caused by salt having two parts. One part is a negative ion, the other is a positive ion. The negative ion surrounds the positive portions of the KC, the KT. The positive ions surround the... Are you basically saying there's more salt in the second one and that's why it works as an ionic surfactant? No, I'm saying it's because of the fact that the salt now takes over because there isn't a sufficient amount of octoxanil 40 to do what it's supposed to do. So you're saying at low levels of O40, the robust stabilization is accomplished by salt and at high levels of O40, the O40 does the robust stabilization? I'm not saying it does the robust stabilization. In fact... Are you saying it doesn't do robust stabilization? It just stabilizes it. What's the difference between stabilized and robust stabilized? I don't know, but that's what the judge at the district court said, that there is no robust stabilization by salt, but octoxanil 40 does give it a robust stabilization. So you want reverse DOE because you have a less robust stabilizer? That's correct. Okay. All right, let's hear from Mr. Brainard and we'll give you some rebuttal time. Good morning, your honors. Good morning. Did you agree that reverse DOE arguments are available in this case regardless of validity, claim, or issue preclusion? No, I don't. First of all... How do you get to say, how do you take claim preclusion or issue preclusion law dealing with validity to say they're blocked from making an argument about infringement? Well, I want to back up. I'll try to answer that question. I think that the court correctly observed that the reverse document equivalent argument is nothing more than trying to re-argue utility. Well, is that your basis then for saying that they can't now make the reverse DOE argument, that it's the equivalent of a validity argument just using different words? Well, I believe that to be the case. I think there are many reasons why the reverse document equivalent argument can't be asserted in this case and why Judge Jenkins got it right by finding there was no triable issue of fact. That's one of them. The court touched briefly upon two other issues, which I think the case law is fairly clear on this. The Amgen case and the Diamond International Corporation case says that this doctrine, this equitable doctrine, is one that should only be preserved and utilized in equity for what they call a radical improver. We've got a generic copier, so under that test or that policy consideration, there should be no reason to apply the doctrine in this case. Well, your adversary says it could be applied to a worse product. Well, I disagree. I think the case law wouldn't support him on that. But that's a matter of policy. But let me ask you, just to understand this case, there was the issue of reverse doctrine and the district court judge didn't apply claim preclusion here, right? He just said there's no triable issue of fact. He found no triable issue of fact. On summary judgment. That's the way it's coming up to this court. That's correct. And then are the validity issues separate? The whole issue we get into in terms of claim preclusion and issue preclusion. That is in the context of the reverse DOE or something else? The way the case is coming up to the court right now, on the reverse doctrine of equivalence, Judge Jenkins found there was no triable issue of fact. And I'm happy to go through and discuss the reasons for that, which I think are accurate. He also looked at claim preclusion and found claim preclusion. And on that basis says that there was no ability for the other side to open up any validity issues again. He also found issue preclusion, but recognized there was an exception to issue preclusion if there were a major change in the law. Were these alternative holdings? No. I mean, are these alternatives to get to the same place or are they really separate issues? I mean, what do we have to decide here? We have to decide, let's assume we would agree hypothetically with what the district court decided on reverse DOE summary judgment. Do we still, are there other validity issues hanging out there in which we would have to agree or disagree with the district court on claim preclusion or issue preclusion? The way I see this case, if the court rejects the reverse doctrine of equivalence argument, they've already admitted literal infringement by virtue of their responses to the request for admissions in the trial court. Right. There's nothing left to try and I think that there's no reason to get into this. So there's no other validity issue that they're seeking to try in the outside of the reverse doctrine of equivalent thing, which is an infringement issue? Counsel can correct me if I'm wrong, but I believe if they lose the reverse doctrine of equivalence argument, they're not inclined to go back and try to reopen the validity issues. But was the district court, was Judge Jenkins giving alternative holdings? No. What Judge Jenkins did is the following. We took the reverse doctrine of equivalence argument on its own merits, so to speak. And we argued and he agreed with us that there was no triable issue of fact because they had not presented any relevant evidence that would support their principle of the invention. Not only that, but their principle of the invention was directly contrary to the relevant evidence, namely the intrinsic record. Right. That's what he found and I'm happy to discuss any aspect of that with this court. What we're trying to understand is why he needed to make a finding on both reverse doctrine of equivalence and on claim preclusion. Because in the sort of the way the case kind of came back up to him, this case got resurrected after Syntex, the original case, was finally resolved. At that point in time, they were suggesting that they were going to attack both infringement and validity. So Judge Jenkins felt in the motions addressed the ability of whether or not they could ever raise the validity issues again. So there are two separate issues here, reverse DOE involving infringement. Well, there are two separate issues and they've come up to you. Yes, I agree with that. And then the third thing Judge Jenkins did in his opinion was he said, I find that there's issue preclusion, but I recognize the other side is trying to assert an exception, a major change in the law exception based upon KSR. And because I have found claim preclusion, I don't need to go to that issue. And he did not go to that issue. Okay, but so we have to reach, there are two sort of separate issues here and we can confirm this with the other counsel. One on reverse discrimination, non-infringement, summary judgment. And the other is even if we disagree or agree with that. This is really expanding my jurisdiction. Reverse discrimination, non-infringement, summary judgment. I'm sorry. It's the influence of having you here that gets me. I firmly believe, Your Honor, I could be wrong. I mean, they can certainly speak for themselves. But I firmly believe that if this court were to find that the reverse document equivalence does not apply, that would end the issue. But there are theoretically two issues that Judge Jenkins decided and they have filed papers and they have teed the issue up, if I can use a golf metaphor, on both issues. And so I'm prepared. Can I ask you something about just the claim preclusion? I don't think it necessarily is something we have to resolve here, but the district court did make reference to the law on claim preclusion, as I recall, suggesting that if you've ever litigated one validity issue, for example, obviousness, then all other validity issues are similarly precluded. Is that your view of the law? For example, if you had obvious and then they come back with inequitable conduct or not unenforceability or anticipation or something else, do you agree? One, is that the way you read what the district court said? And two, do you agree that that's a correct statement? I agree that on the issue of validity, having been fully litigated in the trial court, having come to this court twice on obviousness and having a final and binding judgment that the 493 patent is valid and enforceable, that those findings encompass any issue that could have been raised in connection with those, or any argument, I should say, that could have been raised in connection with those offenses. I think that is the law. Are you, in effect, predicting that if they lose on reverse DOE, the other side will give up in the future? Well, they haven't given up yet, Your Honor. I noticed that. So you're just making a prediction, it sounds like to me. I can't for the life of me believe, well, first of all, I don't think they can go back and litigate validity, but I don't know why they would want to go back and litigate validity. We would have a final and binding judgment on infringement, which is, I understand it, until they could undermine the validity of this patent, if they could. I don't think they can as a matter of fact, and I don't think they can as a matter of law, as a matter of claim preclusion. But, I mean, very frankly, as a practical matter, they couldn't go back to the FDA with a binding finding of infringement and get an ANDA issued until such time as they had a final and binding judgment that the patent was invalid. I can't speak for them. They may want to do this. They haven't given up yet. We never know what they're going to do next. I'm just trying to be sure I understand the answer to Judge Pro's question, which was, do we have to decide both claim preclusion regarding validity and reverse DOE? And I think the answer is yes, because on the state of the case as it is in front of us today, nothing relating to validity has been forfeited. So we do have to decide both. That issue is before you. There's no question about it. That issue is before you. Well, I mean, under Cardinal, we can't duck it. We have to decide it. It was decided by the district court. It's here. It's contested by the other side. So I think Judge Pro's is right. We have to decide the validity preclusion issues as well as the reverse DOE question. At 0.004% 040, does your product robustly stabilize? Well, there's a finding to that effect by Judge Jenkins, and I'm happy to read it to you. And just robustability versus stability, robustability became a term that was used frequently at the trial court during the three-week trial in this case. And I don't know whether Judge Jenkins formally articulated a definition of robustability, but essentially that term came to mean the ability to maintain the stability of the formulation in different kinds of weather and temperature conditions and with different qualities of ingredients, same ingredients but different, say, suppliers, put into the formulation. That became sort of the notion of robustability. I don't really think that that issue is totally germane to what's going on here, but there is a finding, finding number 50, which, by the way, in their brief, reply brief at page 13, they say we're bound because everybody's bound by. I'm happy to agree with them. And that's found at A264, finding 50. And this is Judge Jenkins' binding findings on the parties in which he says studies performed by Teresa Kwan, who, by the way, testified at trial, confirmed both the existence of an interaction between keterolic promethamine and BAC and the role of octoxinol-40 in minimizing the interaction and promoting solution clarity. Ms. Kwan tested formulations that included 0.04 weight per volume keterolic promethamine. Octoxinol-40 tested at concentrations from 0.001 to 0.005, well below the critical micelle concentration identified by Dr. Mitra in his declaration. Why doesn't that defeat summary judgment? One expert says yes and the other expert says no on the precise same concentration. Because this is a binding finding. What this finding finds is that the tests also confirm that octoxinol-40 minimizes interaction between BAC and keterolic because turbidity decreased in otherwise identical solutions when the concentration of octoxinol-40 was increased. And 0.004 is at the higher end of that range. What is a micelle? Pardon me? What is a micelle? A micelle is a, and I'm not a scientist. At least it's not MySpace, right? It's been a long time since I had to stand before Judge Jenkins and talk about micelles, so I may be a little rusty on this. But a micelle is a unit that the surfactant forms in which it either encapsulates the two competing ingredients that keeps them in solution or traps some portion of them. But a micelle is a structure that is formed by the surfactant in combination with all the other ingredients I might add, which is very important to take into consideration because one of the problems that they have from the get-go is in trying to create this principle of the invention, they focus on only one ingredient, which the Sienna case tells us is totally improper, that you have to look at the formulation as a whole. They don't do that. Dr. Mitra's proffered principle of the invention doesn't do that. And so, from a very fundamental basis, his proffered principle of the invention fails as a matter of law. It also fails as a matter of evidence because his principle of the invention was based entirely upon his reading of seven findings of fact that Judge Jenkins made in the original trial that were made on the issue of utility. And utility was litigated extremely hard for three weeks. That was the thrust of that litigation. And those utility findings were in turn based upon tests that first became public really at the time of that trial. And so, here we have a situation where he's basing a principle of the invention on utility findings based upon tests that were basically revealed to the public 11 years after the patent issue. And that cannot be a proper basis or relevant evidence to support a principle of the invention. And furthermore, and I think very importantly here, so just dropping back a little bit, it's clear that Dr. Mitra did not rely upon intrinsic evidence. The case law tells us, Scripps, Sienna, and other cases tell us that that is the touchstone of trying to find a principle of the invention if one is going to apply this equitable principle. He didn't do that. And not only that, when you go to the intrinsic evidence, his principle of the invention is directly contrary to it. First of all, as I think one of your honorees pointed out already, there's no reference to micelle, micelle formation, critical micelle concentration in the claims, in the specification, in the prosecution history. I think what he's trying to argue is that micelle is a synonym for robust stabilized. Well, stabilized is not a claim term, not a claim limitation, nor is robust a stability claim limitation. But the final thing is, and we could, sort of an interesting intellectual exercise, whether you want to transport the Phillips, your Phillips-Umbach case about claim construction, because talking about the equitable scope of a claim is in a sense talking about some form of claim construction, I suppose. But what we have here is a situation where we, if you go to the specification, which Phillips tells us is the very best source for trying to understand the scope and meaning of a claim term or a claim. If we go to the specification, we go to column 7 of the patent, we go to example 3 in column 7, what do we find? A standard pharmaceutical formulation established by the inventors, an embodiment, a preferred embodiment, which has BAC, keterolic, and octoxinil-40 at .004. The very formulation, they say, somehow should be read out of these claims, or the claims should be narrowed. And so what you have here is after the fact, hindsight, expert testimony, attempting to read a preferred embodiment out of the claim. Before you run out of time, just maybe a theoretical sort of intellectual question, but we're on summary judgment, so there's de novo review. But as I understand the case law, the standard of review for infringement under the reverse doctrine of equivalence, it's a question of fact, not a question of law. Is that your understanding? And so the second part of that is the quote from Scripps, your reliance on Scripps, where you look at the spec and the prosecution is doing the prior art. I mean, we review the edit for an abusive... What's the standard of our review? Well, that's a very interesting question and one I actually struggle a bit with. I would take the position that the principle of the invention, which is an equitable concept, is one for the court. I mean, either it's sort of akin to claim construction, which is a matter of law, or it's a matter of equity, but either way, it's an issue for the court. Yes, but if a district judge decides an equitable issue, what's the standard of review of the district judge on that issue is, I think, what Judge Prost is asking. Well, I guess I would hearken it back to claim construction. If it were akin to claim construction, it would be a de novo review. Recognizing that Judge Jenkins did not... All Judge Jenkins did... If it weren't a patent case and it was a finding of fact by a district judge, ordinarily it could be anywhere from clearly erroneous to abuse of discretion. I mean, there are various possible standards of review. The question is, do those change because this is a patent case? Well, I don't... I think there are two aspects. They have the burden of proof to come forward with a permafasciate case on reverse doctrinal equivalence on two issues. The principle of the invention... So we're looking at the determination of the principle of the invention, that's what I'm asking. And then, of course, the application of the accused product to whatever you decide is the principle. That, I think, is a factual inquiry. I think the principle of the invention, as I said before, is more akin to a claim construction or equity issue, which would be a matter for the court, and therefore I would assume... I can't find any law in these cases to tell me one way or another. It's an interesting question. I can't find any specific law that tells me one way or another, but I suppose I could make a strong argument that it would be a matter for de novo review should you choose to exercise it. I think we have your case. Thank you, sir. Thank you. Two minutes for rebuttal. I guess my Reservation 5 isn't going to count. Well, we jointly expended it, so you're getting two as a bonus. We do take at least 30 seconds to answer the question about whether or not it's just the reverse doctrinal equivalence question before arrest, or whether we also reach the claim preclusion issue on validity. Well, Your Honor, if the reverse doctrinal equivalence isn't appropriate here, then you would have a case where there is claim preclusion. But the reverse doctrinal equivalence is appropriate here. In other words, if we were to agree with the district court hypothetically on the reverse doctrinal equivalence, we don't have to reach claim preclusion? Well, he didn't make any findings on reverse doctrinal equivalence. He basically found two things, Your Honor, which was the basis for his opinion. Well, he granted summary judgment on that. Yes, and let me just tell you why he granted summary judgment. Number one, he believed the defendant's counsel. And he basically said that the principle of the invention is determined only by the intrinsic evidence. And he relied on scripts. Scripts specifically had a situation where the defendant said that the principle has to be determined by looking at the prior art. And scripts then ordered a trial reversing the summary judgment and saying, this is something that has to be found at trial. In the other case, the SRI case, the Court of Appeals for the Federal Circuit, again, said you need to have a trial because sometimes it isn't clear from the specification or anything that's in the intrinsic evidence what the principle of the invention is. So it's going to have to be tried. That's how you determine the principle of the invention. In this case, the principle of the invention was set forth so that the judge below was able to say, this is why the patent is valid. And it's valid because of the super stabilization caused by the mycelization of the toxinal 40 to dissolve the KT and the back ions. Otherwise, they're not soluble in a solution. That's why you needed the super solubility. However, with salt stabilization, you don't. And the thing is, Your Honor, there are several cases from the Court of Appeals for the Federal Circuit where stabilization wasn't in the case. And yet, stabilization was read into the claims. And the thing is, in this case, the Court of Appeals for the Federal Circuit said that stabilization is a result. And the thing is, that's what the octoxinal 40 is being put in here for, and it doesn't stabilize in this situation in the amounts that are in the and the to. And it has a completely different principle of operation. And as a result, we're entitled under the Supreme Court's holdings that this is the reverse doctrine of equivalence. Both the Westinghouse case and the Graver Tank case, both from the Supreme Court, say this is a doctrine that effectively prevents a plaintiff from extending his claim too broadly. And that's what we're asking this court to rule on, that you have to have expert testimony, and it's a finding of fact that's it was. I think we've got your answers. Well, I would just like to ask the court that it reverse the district court's holding and remand. We thank both counsel. The case is submitted. Thank you. Thank you very much. All rise. The honorable court has adjourned until tomorrow morning at 10 a.m. Commander, it's good to see you again. It's always a pleasure. See you next time.